Dana HEDGES and George Hedges, on behalf of C.D., a minor, Plaintiffs,

v.

Ralph MUSCO, individually and as Principal of Northern Highlands High School; Greg McDonald; Cathy Kiely; Northern Highlands Regional High School Board of Education; Alan Geisenheimer, individually and as President and a Member of the Northern Highlands Regional High School Board of Education; William Beisswanger, individually and as President and a Member of the Northern Highlands Regional High School Board of Education; Mary Laurent; Barclay Blayman; Harold Deniear; Lynette Krueger; Patricia Dubie; Linda Kempey; Nora Oliver; Tina Malizia; and Neal Strohmeyer, individually and as Members of the Northern Highlands Regional High School Board of Education; Urgent Care–Waldwick; Health Net Medical Group; and Barbara Newman, Defendants.

No. Civ. 96–5135(JAG).

United States District Court, D. New Jersey.

Jan. 26, 1999.

372

Stephen M. Latimer, Hackensack, NJ, for plaintiffs.

Robert T. Morgenstern, Dolan & Dolan, P.A., Newton, NJ, for defendants Northern Highlands Regional High School Board of Education et al.

Douglas J. Sherman, Ruprecht, Hart & Weeks, LLP, Millburn, NJ, for defendants Health Net Medical Group of New Jersey and Barbara Neumann.

**OPINION**

GREENAWAY, District Judge.

This matter comes before the Court on the motion for summary judgment of Defendants Ralph Musco, Greg McDonald, Cathy Kiely, Northern Highlands Regional High School Board of Education, Alan Geisenheimer, William Beisswanger, Mary Laurent, Barclay Blayman, Harold Deniear, Lynette Krueger, Patricia Dubie, Linda Kempey, Nora Oliver, Tina Malizia and Neal Strohmeyer (the "NHRHS Defendants"), Urgent Care–Waldwick, Health Net Medical Group and Barbara Neumann (incorrectly named in the Complaint as Barbara Newman) (the "Medical Defendants") (collectively "Defendants"). This Court must also resolve the cross-motion for summary judgment on Counts I, II, III and IV of Plaintiffs Dana and George Hedges ("Plaintiffs").[1]

This is a civil rights action under 42 U.S.C. § 1983. Plaintiffs allege that the NHRHS Defendants subjected their daughter, a student at Northern Highlands Regional High School "NHRHS"), to an intrusive search including testing of bodily fluids, without reasonable suspicion, in violation of the Fourth and Fourteenth Amendments' protection against unreasonable searches and seizures. Plaintiffs further allege that Defendants disclosed the results of the search to NHRHS students in violation of their daughter's right to privacy under the Ninth and Fourteenth Amendments. Plaintiffs also assert a pendent state claim for assault and battery against the Medical Defendants. For the reasons set forth below, the Court shall (1) grant Defendants' motion for summary judgment; and (2) deny Plaintiffs' cross-motion for summary judgment on Counts I, II, III and IV.

### FACTS

On April 8, 1996, Plaintiffs' daughter, Tara Hedges ("Tara") was a student at NHRHS

---

1. The caption states that the Plaintiffs filed the Complaint on behalf of C.D., a minor. Plaintiffs' counsel selected the initials "C.D." at random in order to protect the identity of Plaintiffs' daughter, the allegedly injured party. However, throughout their briefs and submissions, the parties have referred to Plaintiffs' daughter by her real name, Tara Hedges. Accordingly, the Court shall do the same.

enrolled in Defendant Greg McDonald's math class.[2] At approximately 9:18 a.m. on April 18, 1996, Tara entered Mr. McDonald's classroom for her third period math class. Mr. McDonald noticed that Tara's face was flushed and her eyes were glassy and red. Her pupils appeared very wide. Further, Tara seemed very talkative and outgoing even though she was usually quiet.

During math class, Tara obtained Mr. McDonald's permission to leave the room to go get a drink of water. The water fountain is located within view of Mr. McDonald's classroom door. However, Mr. McDonald observed Tara go in the opposite direction of the water fountain and disappear around the corner of the hallway. Mr. McDonald testified that it was not consistent with Tara's normal behavior to ask permission to go someplace and then leave the room to go elsewhere. McDonald Dep. at 43:3–7.

Tara was gone for approximately ten minutes.[3] Based on Tara's appearance (the red and glassy eyes) and her uncharacteristic behavior, Mr. McDonald concluded that Tara might be "high", i.e., under the influence of drugs or alcohol.

The Northern Highlands Regional High School Board of Education's Revised Drug, Alcohol and Tobacco Policy ("NHRHS Policy" or "Policy") provides that:

> Any staff member to whom it appears that a pupil may be under the influence of alcoholic beverages or other drugs on school property or at a school function shall report the matter as soon as possible to the Principal or his/her designee. The substance abuse counselor and nurse shall be notified by the Principal/designee.

NHRHS Policy at 1, ¶ 1. In accordance with this Policy, Mr. McDonald contacted a school administrator to report his suspicion that Tara was high.

The NHRHS Policy further provides that the student suspected of being under the influence of drugs or alcohol "shall be escorted to the school nurse for an examination of any dangerous vital signs." Id. at 1, ¶ 2. At the end of the class period, a school security guard escorted Tara from Mr. McDonald's classroom to the nurse's office.

The school nurse, Defendant Cathy Kiely testified that her first impression of Tara when she saw her that day was "oh, my God, she looked so high.... She just looked totally out of it. She just didn't know where she was. Her eyes were red, they were glassy, she looked stuporous, she looked high ... [She had a] [b]lank look, staring into space, looking right through me, just out of it." Kiely Dep. at 20:17–21:3. Nurse Kiely informed Tara that she was suspected of being under the influence of drugs or alcohol and she would have to take her vital signs. Nurse Kiely checked Tara's vital signs and found that her blood pressure was elevated but her pulse and respirations were normal. Although Tara's eyes were bloodshot, her pupils were normal.

The school principal, Defendant Ralph Musco, came by Nurse Kiely's office and saw Tara. He noticed that Tara's eyes appeared red and glassy. He asked Tara why her eyes were so red and she explained that she had been crying.

The NHRHS Policy provides that "[f]or students suspected of being under the influence of alcohol/drugs ... the Principal/designee may conduct a search, including lockers

**2.** Tara is classified as perceptually impaired. She has problems with short term memory and does not retain information unless she both sees and hears the information. The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C.A. § 1400 et seq. (West 1998), classifies perceptual disabilities as specific learning disabilities. See 20 U.S.C.A. § 1401(26)(B). Similarly, New Jersey classifies as handicapped any child who is perceptually impaired. See N.J.Stat.Ann. § 18A:46–1 (West 1998). A specific learning disability is "a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, which disorder may manifest itself in imperfect ability to listen, think, speak, read, write, spell, or do mathematical calculations." 20 U.S.C.A. § 1401(26)(A).

**3.** Tara was in the lavatory during this time. School security officer Justine Rucki saw Tara in the bathroom. T. Hedges Dep. at 7:25–8:13. Ms. Rucki testified that Tara's eyes were red and she looked sick. Rucki Dep. at 7:13–22; 11:6–20. Ms. Rucki suggested that Tara go see the school nurse but Tara said she was fine. Id. at 7:23–25.

and bookbags, luggage, etc. . . . " NHRHS Policy at 3, ¶ 3. In accordance with the Policy, a school security guard searched Tara's locker. The guard did not find anything incriminating in the locker. The guard also searched Tara's bookbag in Tara's and Nurse Kiely's presence. The search revealed an old, worn, plastic bottle containing some small white pills and a large brown pill. Tara told Nurse Kiely that they were diet pills.[4]

The NHRHS Policy further provides that when a student is suspected of being under the influence of drugs or alcohol, "[t]he Principal/designee shall immediately notify a parent or guardian and the Superintendent and arrange for an immediate medical examination of the student." Id. at 1, ¶ 3. In accordance with the Policy, Nurse Kiely called Tara's father, Plaintiff George Hedges, and asked him to come to her office. When Mr. Hedges arrived, Nurse Kiely informed him that Tara was suspected of being under the influence of drugs or alcohol. Mr. Musco showed Mr. Hedges the pills they found in Tara's bookbag. Mr. Hedges took the pills stating that he would find out what they were.[5]

Either Nurse Kiely or Mr. Musco told Mr. Hedges that Tara would have to be bested for drug and alcohol use before she would be permitted to return to school. Mr. Hedges asked where he should take Tara to be tested. G. Hedges Dep. at 12: 15–17; 14:23–15.4. Nurse Kiely told him that the school generally used Urgent Care. *Id.* at 14:23–15:4. Nurse Kiely testified that she told Mr. Hedges that the school would pay the bill if he used Urgent Care.[6] Kiely Dep. at 36:24–25. However, Mr. Hedges testified that the issue of who would pay for the tests never came up. G. Hedges Dep. at 13:25–14:7.

The NHRHS Policy provides that "[t]he examination may be performed by a physician selected by the parent or guardian, or by the school doctor if s/he is immediately available(4)27 If, at the request of the parent or guardian, the medical examination is conducted by a physician other than the school doctor, such an examination shall be at the expense of the parent and not the school district." NHRHS Policy at 1, ¶¶ 3 and 4. No one informed Mr. Hedges that he could have his own physician perform the drug and alcohol tests at his own expense. Kiely Dep. at 37:1–14. Mr. Hedges did not ask whether he could take Tara to another doctor or facility other than Urgent Care for testing. G. Hedges Dep. at 13:22–24.

*Urgent Care*

When Mr. Hedges and Tara arrived at Urgent Care, they checked in with the receptionist. The receptionist handed Mr. Hedges two forms: (1) a registration and consent form; and (2) a release form. Mr. Hedges filled out both forms, signed his name at the bottom of the forms and handed them back to the receptionist.[7] Printed above Mr. Hedges' signature, the registration and consent form states: "I CONSENT TO TREATMENT NECESSARY FOR THE CARE OF THE ABOVE PATIENT. . . . I HAVE READ AND FULLY UNDERSTAND THE ABOVE CONSENT FOR TREATMENT, RELEASE OF MEDICAL INFORMATION, INSURANCE AUTHORIZATION AND MY FINANCIAL RESPONSIBILITY." Sherman Cert., Ex. B (Registration and Consent Form).

Shortly thereafter, Dr. Foley[8], an Urgent Care doctor, examined Tara. Dr. Foley concluded that based on the physical examination, Tara did "not appear to be under the influence of any illicit substance or alcohol" and there was "no evidence of any chronic

---

4. NHRHS students are prohibited from possessing medication of any kind including prescription and over the counter medications such as aspirin. Def.'s Answer to Pl.'s First Set of Interrogs. to Def. Kiely ¶ 2.

5. Mr. Hedges never had the pills tested. He claims that he showed the pills to a pharmacist who opined that they could be diet pills and vitamins. For purposes of this motion, the NHRHS Defendants concede that the pills were diet pills and vitamins.

6. Urgent Care is now known as "Health Net Medical Group of New Jersey".

7. Urgent Care and NHRHS had an agreement which provided that Urgent Care would perform drug screening and urine collection for students referred by the school. The agreement required Urgent Care to obtain parental consent and a release of medical information.

8. Dr. Foley has not been named as a defendant.

use of illicit substances or alcohol." Latimer Cert., Ex. E (Dr. Foley's report). Tara then provided Urgent Care with a urine specimen.

While Mr. Hedges was waiting for Tara outside of the examination room, he saw Defendant Barbara Neumann, the phlebotomist, walking towards the examination room with a needle. He asked Ms. Neumann why she had a needle and she replied that Tara had to have a blood test. After hearing this information, Mr. Hedges left Urgent Care and walked to a nearby pharmacy by himself.[9] He did not withdraw his consent allowing Urgent Care to perform Tara's blood test.

Ms. Neumann attempted to draw blood from Tara's right arm but was unsuccessful. She then attempted to draw blood from Tara's left arm but was also unsuccessful. According to Ms. Neumann, after the two unsuccessful attempts, she left the room and summoned Dr. Foley. Tara testified, however, that Ms. Neumann stuck her arms five times unsuccessfully before asking for Dr. Foley's help. Tara also testified that when Ms. Neumann left the room to get Dr. Foley, she left the tourniquet on her arm. Ms. Neumann denies doing so. Dr. Foley was able to draw blood from Tara's arm on his first attempt. Plaintiffs allege that Tara suffered hematoma in both arms as a result of Ms. Neumann's actions. In support of this allegation, Plaintiffs have submitted photographs depicting Tara's arms following the blood test. Latimer Cert., Ex. G.

Later that day, Mr. Hedges contacted his attorney, Warren Clark. The next day, April 9, 1996, Plaintiffs, Tara and Mr. Clark met with Mr. Musco at 7:20 a.m. Nurse Kiely called Urgent Care at approximately 7:30 a.m. that same morning for the results of Tara's drug and alcohol tests. The tests results were negative for drugs and alcohol and NHRHS readmitted Tara in time for her second period class on April 9.

When Tara returned to school that day, a student approached her and told her he had overheard Nurse Kiely on the phone when she was obtaining Tara's results. The student told Tara that he heard Nurse Kiely say, "Negative? Are you sure? You are kidding. I am shocked." T. Hedges Dep. at 79:13–17; *accord* Kiely Dep. at 54:24–25. By the end of the school day many students knew that Tara had been tested for drugs and alcohol. T. Hedges Dep. at 52:7–12. Thirty to forty students asked Tara what had happened and asked to see the bruises on her arms. *Id.* at 52:1–53:3. They asked if she had been caught using drugs. *Id.* at 52:24–53:10.

Plaintiffs filed suit on October 30, 1996. Plaintiffs allege that there was no reasonable suspicion for the search including the testing of bodily fluids. Plaintiffs allege that as a result of the NHRHS Defendants' actions, Tara has been stigmatized by her fellow students as a drug user. Plaintiffs further allege that Ms. Neumann committed assault and battery by attempting to draw blood without Plaintiffs' consent. Plaintiffs also contend that the NHRHS Board of Education failed to train its staff properly. In particular, Plaintiffs allege, staff members did not know or follow proper procedures when a student was suspected of being under the influence of drugs or alcohol.

The NHRHS Defendants filed a cross-claim against the Medical Defendants for contribution and indemnification. The Medical Defendants filed a cross-claim for contribution against the NHRHS Defendants. All of the defendants have moved for summary judgment. Plaintiffs have cross-moved for summary judgment on Counts I, II, III and IV.

## DISCUSSION

### STANDARD FOR SUMMARY JUDGMENT

Fed.R.Civ.P. 56(c) provides for summary judgment when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91

---

9. Mr. Hedges walked to the pharmacy to inquire about the pills in Tara's bookbag. However, the pharmacist was busy with other customers so Mr. Hedges left and returned to Urgent Care to pick up Tara.

L.Ed.2d 265 (1986); *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir.1996). In making this determination, the court must draw all reasonable inferences in favor of the non-movant. *See Hullett v. Towers, Perrin, Forster & Crosby, Inc.*, 38 F.3d 107, 111 (3d Cir.1994); *National State Bank v. Federal Reserve Bank of New York*, 979 F.2d 1579, 1581 (3d Cir.1992).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *See Jersey Cent. Power & Light Co. v. Lacey Township*, 772 F.2d 1103, 1109 (3d Cir.1985). The party opposing the motion for summary judgment cannot rest on mere allegations and must instead present actual evidence that creates a genuine issue as to a material fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130–31 (3d Cir. 1995). "[U]nsupported allegations in [a plaintiff's] memorandum and pleadings are insufficient to repel summary judgment." *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir.1990); see also Fed. R.Civ.P. 56(e) (requiring non-moving party to "set forth specific facts showing that there is a genuine issue for trial."). In determining whether there are any issues of material fact, the court must resolve all reasonable doubts as to the existence of a material fact against the moving party. *See Smith v. Pittsburgh Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir.1972).

Defendants argue that there are no genuine issues as to a material fact remaining for trial. Plaintiffs agree that there are no genuine issues as to a material fact in dispute with regard to Counts I, II, III and IV, the unreasonable search and seizure claims. However, Plaintiffs contend that genuine issues as to material facts exist with regard to the remaining counts. Since this Court concludes that Defendants are immune from suit, this Court need not address whether a genuine issue as to a material fact exists on these remaining counts.

## SECTION 1983

■ To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that: (1) the conduct complained of was committed by a person acting under color of state law; and (2) that his conduct deprived plaintiff of rights, privileges or immunities secured by the United States Constitution or laws of the United States.[10] *See West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); *Shaw by Strain v. Strackhouse*, 920 F.2d 1135, 1141–42 (3d Cir.1990); *McArdle v. Tronetti*, 769 F.Supp. 188, 190 (W.D.Pa.1991), *aff'd*, 961 F.2d 1083 (3d Cir.1992).

■ Section 1983 does not create any rights, but instead provides a remedy for violation of those rights created by the United States Constitution or federal law. *See Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906–07 (3d Cir.1997); *Baker v. McCollan*, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979).

Plaintiffs base their § 1983 claims on violations of the Fourth, Ninth and Fourteenth Amendments of the United States Constitution and the New Jersey Constitution.

## UNREASONABLE SEARCH AND SEIZURE

Counts I and II allege that Mr. McDonald reported Tara to the school administrator without having reasonable suspicion that Tara was under the influence of drugs or alcohol. Counts III and IV allege that Nurse Kiely and Mr. Musco ordered blood and urine samples without reasonable suspicion. Plaintiffs assert that these actions constitute an unreasonable search and seizure in violation of the Fourth and Fourteenth Amendments of the United States Constitution and Article 1, ¶ 7 of the New Jersey Constitution.

10. Specifically, 42 U.S.C. § 1983 provides in part that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proceeding for redress.

■ The Fourth Amendment ensures that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const., Amend. IV; *accord* N.J. Const. art. 1, ¶ 7 (West 1997).[11] The United States Constitution, "by virtue of the Fourteenth Amendment, prohibits unreasonable searches and seizures by state officers." *New Jersey v. T.L.O.*, 469 U.S. 325, 334, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (quoting *Elkins v. United States*, 364 U.S. 206, 213, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960)). As state officers, public school officials are subject to the Fourth Amendment's prohibition against unreasonable searches and seizures. *See id.* Thus, the Supreme Court has held that "the Fourth Amendment applies to searches conducted by school authorities". *Id.* at 337, 105 S.Ct. 733.

■ A school's search of a student's person, in this case by virtue of a urinalysis and blood test and the search of a bookbag, "no less than a similar search carried out on an adult, is undoubtedly a severe violation of subjective expectations of privacy." *Id.* at 337–38, 105 S.Ct. 733;[12] see also *United States v. Ward*, 131 F.3d 335, 340 (3d Cir. 1997) (a compelled blood test is a body intrusion and a search within the meaning of the Fourth Amendment). A pupil's legitimate privacy interest, however, must be balanced against "the substantial interest of teachers and administrators in maintaining discipline in the classroom and on school grounds." *Id.* at 339.

In *T.L.O.*, the Supreme Court held that although, ordinarily, a state official must have probable cause to believe that a crime has been committed before conducting a search, the probable cause standard is inapplicable in a school setting. 469 U.S. at 340,

105 S.Ct. 733. "Rather, the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search." *Id.* at 341, 105 S.Ct. 733. A school official's search of a student's person or his or her property is reasonable if (1) "the ... action was justified at its inception," and (2) "the search as actually conducted was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* (internal citations and quotations omitted). The Court further held that a search "will be 'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." *Id.* at 341–42, 105 S.Ct. 733. A search "will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.* at 342, 105 S.Ct. 733.

Plaintiffs claim Mr. McDonald reported Tara to the school administrator without having reasonable suspicion that Tara was under the influence of drugs or alcohol. Plaintiffs further allege that Nurse Kiely and Mr. Musco ordered blood and urine samples without reasonable suspicion. This Court, however, need not address the reasonableness of Defendant's actions based on Defendants' immunity.

### *Immunity Under N.J.Stat.Ann. § 18A:40A–13*

■ The New Jersey Legislature has enacted legislation directed at preventing and eliminating drug and alcohol abuse in its schools. See N.J.Stat.Ann. § 18A:40A–8 et seq. (West 1998). N.J.Stat.Ann. § 18A:40A–10 and § 18A:40A–11 require local boards of

---

11. The New Jersey Constitution provides in relevant part:

 The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated;

 N.J.Const. art. 1, ¶ 7.

12. The Supreme Court has not addressed whether a pupil has a legitimate expectation of privacy in her locker nor has the Court expressed any opinion on the standards governing school offi-

cials' searches of student lockers. *See T.L.O.*, 469 U.S. at 338 n. 5, 105 S.Ct. 733. The Supreme Court of New Jersey, however, held in *State v. Engerud*, 94 N.J. 331, 348, 463 A.2d 934 (1983), that "the student had an expectation of privacy in the context of his locker." The Court reasoned that "[f]or the four years of high school, the school locker is a home away from home [and] [i]n it the student stores the kind of personal 'effects' protected by the Fourth Amendment." *Id.*

education to adopt and implement comprehensive substance abuse evaluation procedures and prevention, intervention and treatment programs in their respective school districts. In addition, N.J.Stat.Ann. § 18A:40A–12 specifically provides:

> a. Whenever it shall appear to any teaching staff member, school nurse or other educational personnel of any public school in this State that a pupil may be under the influence of substances as defined pursuant to section 2 of this act, other than anabolic steroids, that teaching staff member, school nurse or other educational personnel shall report the matter as soon as possible to the school nurse or medical inspector, as the case may be, or to a substance awareness coordinator, and to the principal or, in his absence, to his designee. The principal or his designee, shall immediately notify the parent or guardian and the superintendent of schools, if there be one, or the administrative principal and shall arrange for an immediate examination of the pupil by a doctor selected by the parent or guardian, or if that doctor is not immediately available, by the medical inspector, if he is available.... The pupil shall be examined as soon as possible for the purpose of diagnosing whether or not the pupil is under such influence. A written report of that examination shall be furnished within 24 hours by the examining physician to the parent or guardian of the pupil and to the superintendent of schools or administrative principal.

(West 1998).

█ The regulations promulgated thereunder track the language of N.J.Stat.Ann. § 18A:40A–12, see N.J. Admin.Code tit. 6, § 29–6.5, and mandate that the "[d]istrict board of education ... adopt and implement polices and procedures for the evaluation ...

of pupils ... who on reasonable grounds are suspected of being under the influence" of drugs and alcohol. See N.J.Admin.Code tit. 6, § 29–6.3; *accord* N.J.Stat.Ann. § 18A:40A–10. The NHRHS Policy merely complies with this mandate and incorporates the provisions of N.J.Stat.Ann. § 18A:40A–12 and N.J.Admin.Code tit. 6, § 29–6.1–6.5 into its policy. *See* NHRHS Policy (stating that "the following policies and procedures are in accordance with [N.J.Admin.Code tit. 6, § 29–6.1–6.5]" and citing to N.J.Stat.Ann. §§ 18A:40A–12, 18A:40A–13, 18A:40A–14).

█ Mr. McDonald was acting in accordance with the provisions of the NHRHS policy, the statute and the regulations when he, a "staff member" reported Tara to the school administrator because it appeared to him that she "may be under the influence of alcoholic beverages or other drugs on school property". NHRHS Policy at 1, ¶ 1; N.J.Admin.Code tit. 6, § 29–6.5(a)(1); *accord* N.J.Stat.Ann. § 18A:40A–12(a). Similarly, Nurse Kiely and Mr. Musco were following the NHRHS Policy, the state statute and the regulations when they ordered an "[e]xamination by a physician for the purpose of diagnosing whether [Tara] [was] under the influence of alcohol and/or other drugs." N.J.Admin.Code tit. 6, § 29–6.3(c)(4)(i); *see also* N.J.Admin.Code tit. 6, § 29–6.5(a)(2) (the principal shall "arrange for an immediate examination of the pupil"); N.J.Stat.Ann. § 18A:40A–12 (same).[13] Further, the NHRHS Policy requires a blood test when a student is suspected of being under the influence of drugs or alcohol. *See* NHRHS Policy at 3, ¶ 6.

As part of its scheme to eradicate drug and alcohol abuse in New Jersey schools, the state legislature enacted N.J.Stat.Ann. § 18A:40A–13 which provides in relevant part:

---

**13.** The 1995–96 NHRHS Student/Parent Handbook states that "[i]n accordance with NJSA 18A:40A–12, students are subject to medical examinations ... for drug-related offenses." NHRHS Student/Parent Handbook 1995–1996 at 7, ¶ 6. The 1995–96 NHRHS Faculty Handbook provides that if a staff member suspects that a student is under the influence of drugs or alcohol, he/she has a legal responsibility to notify the principal. *See* NHRHS Faculty Handbook 1995–

1996 at 15, ¶ 1. The principal, in consultation with the school nurse, shall evaluate the student's condition. *See id.* at 15, ¶ 2. "If there is reasonable suspicion, the principal/designee may conduct a search, including lockers and bookbags ..." *Id.* at 15, ¶ 3. "If use is suspected, the parent/guardian will be directed to obtain a blood/urine test for the student. The examination must take place within four (4) hours." *Id.* at 15, ¶ 6.

No action of any kind in any court of competent jurisdiction shall lie against any teaching staff member, including a substance awareness coordinator, **any school nurse** or other educational personnel, medical inspector, examining physician or any other officer, agent **or any employee of the board of education** or personnel of the emergency room of a hospital because of any action taken by virtue of the provisions of this act, provided the skill and care given is that ordinarily required and exercised by other teaching staff members, nurses, educational personnel, medical inspectors, physicians or other officers, agents, or any employees of the board of education or emergency room personnel.

(West 1998) (emphasis added).

Mr. McDonald is a teacher, Nurse Kiely is the school nurse and Mr. Musco is the school principal. They were all following the NHRHS Policy, the state statute and the regulations when they committed the actions Plaintiffs allege violated Tara's constitutional rights against unreasonable searches and seizures.

Therefore, as a matter of law, Mr. McDonald,[14] Nurse Kiely and Mr. Musco are immune from suit "in any court of competent jurisdiction" for any actions taken pursuant to N.J.Stat.Ann. § 18A:40A-12, the regulations and the NHRHS Policy.[15] *See* N.J.Stat.Ann. § 18A:40A-13.

### Defendants' Alleged Violations of the NHRHS Policy

Plaintiffs claim that Nurse Kiely and Mr. Musco did not follow the school's policy in that (a) they did not permit Tara to be examined by the family's physician; (b) no provision was made for Tara's care while she was awaiting the results of the medical examination; (c) Defendants did not provide Plaintiffs with a written report of Tara's medical examination until nine days after the examination; and (d) the results of the examination were disclosed to students and staff. Compl. ¶ 40. The Court shall address each of these allegations separately.

*Failure to Inform Mr. Hedges of Physician of Choice Option*

Plaintiffs claim that Nurse Kiely and Mr. Musco violated the NHRHS Policy because they did not inform Mr. Hedges that he could take Tara to their family physician to be tested. Nurse Kiely and Mr. Musco's failure to explicitly tell Mr. Hedges that he could take Tara to the family physician does not rise to the level of a constitutional violation. More important, Nurse Kiely's and Mr. Musco's omission does not defeat the immunity provided by N.J.Stat.Ann. § 18A:40A-13 because their actions in arranging for the examination were "taken by virtue of the provisions of" N.J.Stat.Ann. § 18A:40A-12. *See* N.J.Stat.Ann. § 18A:40A-13. Furthermore, Mr. Hedges *asked where he should take Tara to be tested.* Either Nurse Kiely or Mr. Musco replied that the school "generally" used Urgent Care in Waldwick on Franklin Turnpike. Kiely Dep. at 36:17-25. The term "generally" implies that there are exceptions. However, Mr. Hedges did not ask whether he could take Tara to be tested elsewhere nor did he mention or request seeing the Hedges' family doctor. G. Hedges Dep. at 13:22-24. Furthermore, neither Nurse Kiely nor Mr. Musco directed or ordered Mr. Hedges to take Tara to Urgent Care.[16] Thus, this Court concludes that De-

---

**14.** Mr. McDonald is also immune under N.J.Stat. Ann. § 18A:40A-14 which provides that:

"Any teacher ... who in good faith reports a pupil to the principal or his designee ... or school nurse in an attempt to help such pupil cure his abuse of substances ... shall not be liable in civil damages as a result of making any such report."

(West 1998).

**15.** *N.J.Stat.Ann. § 18A:40A-13 provides immunity to school personnel so long as "the skill and care given is that ordinarily required and exercised by other such teaching staff members, nurses, educational personnel, (3)27 or any em-*

ployees of the board of education ..." Plaintiffs have not submitted any evidence showing that Mr. McDonald, Nurse Kiely or Mr. Musco failed to meet the standard of skill and care ordinarily exercised by professionals in their field.

**16.** Mrs. Hedges has testified that had she known that Tara could be tested by the family physician, she would not have allowed Tara to be tested at Urgent Care. D. Hedges Dep. at 9:16-22. It is undisputed, however, that Mrs. Hedges was not present when Nurse Kiely or Mr. Musco indicated that their students were generally tested at Urgent Care. Furthermore, before going to Urgent Care, Mr. Hedges and Tara stopped by the

fendants' failure to explicitly tell Mr. Hedges that Tara could be tested by the family doctor, does not constitute a violation of the NHRHS Policy which would defeat their immunity under N.J.Stat.Ann. § 18A:40A–13.

### Failure to Make Appropriate Provisions for Tara's Care During Waiting Period

 Plaintiffs claim that Defendants failed to make appropriate provisions for Tara's care while she was awaiting the results of the medical examination. Compl. ¶ 40(b). Although Plaintiffs made this allegation in their Complaint, they have not stated what provisions Defendants should have made for Tara. Plaintiffs received the results of Tara's examination within 24 hours and Tara was readmitted to school as soon as the NHRHS Defendants learned that the tests results were negative for drugs or alcohol. Plaintiffs' failure to specify what provisions were required for Tara during that 24-hour waiting period precludes a finding by this Court that Defendants violated the NHRHS Policy or behaved negligently.

### Failure to Provide Written Report of Examination Within 24 Hours

 Plaintiffs claim that Defendants violated the NHRHS Policy because they failed to provide them with a written report of Tara's medical examination until nine days after the examination. The NHRHS Policy requires that results of the examination be reported to the parents within 24 hours. NHRHS Policy at 2, ¶ 6. Plaintiffs are putting form over substance. Although Dr. Foley did not prepare his written examination until April 17, 1996, Defendants verbally provided Plaintiffs with the results of the examination within 24 hours and Tara was back in school within that period of time. Further,

the regulations provide that "[i]f the written report of the medical examination is not submitted to the parent or guardian, principal and chief administrator within 24 hours, the pupil shall be allowed to return to school until such time as a positive diagnosis of alcohol or other drug use is received." N.J.Admin.Code tit. 6, § 29–6.5(a)(6). In accordance with the regulations, Defendants allowed Tara to return to school within 24 hours and a diagnosis, albeit an oral one, was received in less than 24 hours.

### Disclosure of Test Results Violates Constitutional Right to Privacy

Plaintiffs assert that Nurse Kiely and Mr. Musco violated the NHRHS Policy by disclosing the results of Tara's test results to students and staff. Further, Counts VII and VIII allege that Mr. Musco's and Nurse Kiely's disclosure of Tara's examination and the results of the drug and alcohol tests violate Tara's right to privacy under the Ninth [17] and Fourteenth Amendments of the United States Constitution and Article 1, ¶ 1 of the New Jersey Constitution.[18]

The NHRHS Policy provides that the result of a pupil's medical examination for drug or alcohol shall only "be shared with the nurse, the substance abuse counselor and the Superintendent". NHRHS Policy at 2, ¶ 6. A student overhead Nurse Kiely on the phone when she called Urgent Care to obtain the results of Tara's drug and alcohol tests. T. Hedges Dep. at 79:13–17. Many NHRHS students discovered that Tara had been tested for drug and alcohol abuse. *Id.* at 52:7–12. Since Defendants' disclosure of Tara's examination and test results is not an "action taken by virtue of the provisions of [N.J.Stat. Ann. § 18A:40A–12]", Defendants are not im-

---

Hedges' residence to speak to Mrs. Hedges but she was not there. Mr. Hedges was unable to speak to Mrs. Hedges about the incident at the school until after he and Tara returned from Urgent Care. Therefore, Mrs. Hedges' testimony that she would not have taken Tara to Urgent Care is not relevant.

17. The Ninth Amendment provides:
 The enumeration in the Constitution of certain rights, shall not be construed to deny or disparage others retained by the people.

U.S. Const., amend. IX.

18. Article 1, ¶ 1 provides:

 All persons are by nature free and independent, and have certain natural and inalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness.

 N.J.Const. art. 1, ¶ 1.

mune from suit on Plaintiffs' right to privacy claims. N.J.Stat.Ann. § 18A:40A–13. Thus, this Court must substantively address the merits of Plaintiffs' allegation that disclosure of Tara's examination violates her constitutional right to privacy.

■ The right to privacy protects two types of privacy interests: "One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." *Whalen v. Roe,* 429 U.S. 589, 599–600, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977) (footnotes omitted). Plaintiffs' asserted privacy interest falls within the first category, the right not to have their personal affairs made public by NHRHS. *See United States v. Westinghouse Elec. Corp.,* 638 F.2d 570, 577 (3d Cir.1980).

■ The Third Circuit has held that an individual's medical condition and medical records are entitled to privacy protection. See id.; *Doe v. SEPTA,* 72 F.3d 1133, 1137 (3d Cir.1995). In the instant case, there has been no disclosure of Tara's medical condition or her medical records. All that has been disclosed is that she tested negative for drugs and alcohol. Plaintiffs refer this Court to *Doe v. Borough of Barrington,* 729 F.Supp. 376 (D.N.J.1990), where the court found that a police officer violated plaintiff's constitutional right to privacy when he disclosed to plaintiff's neighbors that plaintiff had AIDS. *Doe,* however, is inapposite.

The court in *Doe* stated:

The sensitive nature of medical information about AIDS makes a compelling argument for keeping this information confidential ... Also, the privacy interest in one's exposure to the AIDS virus is even greater than one's privacy interest in ordinary medical records because of the stigma that attaches with the disease.

729 F.Supp. at 384. Plaintiffs argue that the *Doe* analysis is applicable in the instant case "because the dissemination of information about the very fact of being tested for drugs and alcohol carries with it a similar stigma". Pl.'s Br. in Support of Cross–Mot. for Summ.J. at 30. This Court disagrees.

In *Doe,* the plaintiff tested positive for the AIDS virus. Conversely, Tara tested negative for intoxication and drug use. Any possible stigma that may attach to being tested for intoxication and drug use does not approach that associated with the AIDS virus especially when Tara's test results for drugs and alcohol were negative.

Furthermore, Defendants never intended for the students at NHRHS to discover that Tara had been tested for drug and alcohol use. There is no evidence that Nurse Kiely expected that students would overhear her telephone conversation with Urgent Care or that she acted negligently which then lead to the disclosure. Consequently, Defendant's motion for summary judgment of Counts VII and VIII is granted.

### FAILURE TO TRAIN NHRHS STAFF

Counts V and VI allege that the members of the NHRHS Board of Education, specifically, Defendants Geisenheimer, Beisswanger, Laurent, Blayman, Deniear, Krueger, Dubie, Kempey, Oliver, Malizia, Strohmeyer and Musco, "were deliberately indifferent to the rights of plaintiff in that they failed to adequately train, supervise and control faculty and staff of NHRHS in the procedures to be followed if a student is suspected of substance abuse." Compl. ¶¶ 57, 60. Plaintiffs further allege that this failure to train "is a policy and practice of the NHRHS Board of Education and Musco" in violation of the Fourth and Fourteenth Amendments of the United States Constitution and Article 1, ¶ 7 of the New Jersey Constitution. *Id.* ¶¶ 58, 61.

■ To hold the members of the NHRHS Board of Education liable on a failure to train theory under § 1983, Plaintiffs must establish that: (1) Nurse Kiely, Mr. McDonald or Mr. Musco inflicted a cognizable injury on Tara; (2) Nurse Kiely, Mr. McDonald or Mr. Musco acted pursuant to a NHRHS Board of Education custom or policy not to adequately train or supervise its employees; (3) there is a direct causal link between the custom or policy and the alleged constitutional violation; and (4) the failure to so train or supervise amounts to deliberate indifference to the rights of the NHRHS pupils. *See City of Canton, Ohio v. Harris,*

489 U.S. 378, 385–88, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *see also Kneipp v. Tedder,* 95 F.3d 1199, 1212 (3d Cir.1996).[19]

■ The NHRHS Board of Education's training or supervision of teachers and non-educational staff must be such that the need for more or different training is so obvious, and the inadequacy of the current training is "so likely to result in violations of constitutional rights", that the NHRHS Board of Education members can "reasonably [be] said to have been deliberately indifferent to the constitutional needs of the [students]." *Board of the County Comm'rs of Bryan County, Okla. v. Brown,* 520 U.S. 397, 117 S.Ct. 1382, 1392, 137 L.Ed.2d 626 (1997).

■ The NHRHS Board of Education's deliberate indifference is not established by 1) presenting evidence of the shortcomings of an individual teacher, nurse or principal[20]; 2) proving that an otherwise sound training program was occasionally administered negligently; or 3) showing, without more, that better training would have enabled a staff member to avoid the injury-causing conduct. *See Simmons v. City of Philadelphia,* 947 F.2d 1042, 1060 (3d Cir.1991) (citing *Canton,* 489 U.S. at 391, 109 S.Ct. 1197). "[M]ere negligence in training [the NHRHS staff members] will not create a Section 1983 claim." *Malignaggi v. County of Gloucester,* 855 F.Supp. 74, 77 (D.N.J.1994) (citing *Canton,* 489 U.S. at 388, 109 S.Ct. 1197).

■ The NHRHS Board of Education and its members are immune from suit pursuant to N.J.Stat.Ann. § 18A:40A–13. As stated above, N.J.Stat.Ann. § 18A:40A–13 grants immunity from suit to "any employee of the board of education" for "any action taken by virtue of the provisions of [N.J.Stat. Ann. § 18A:40A–12], provided the skill and care given is that ordinarily required and exercised by other such ... employees of the board of education ..."

Plaintiffs have not submitted any evidence indicating that the members of the NHRHS Board of Education did not provide the NHRHS teachers and noneducational staff with the training ordinarily provided by other boards of education. Conversely, the NHRHS has shown that it did provide adequate training for the NHRHS staff. Mr. McDonald participated in a three-day training program which addressed the recognition and treatment of students suspected to be under the influence of drugs or alcohol. Morgenstern Aff., Ex. N (training program materials). Indeed, Mr. McDonald was one of two teachers who participated in the drafting of the NHRHS Policy.

Nurse Kiely was an experienced school nurse[21] who was trained in the detection and treatment of students under the influence of drugs and alcohol. In fact, in the 1995–96 school year, Nurse Kiely sent eight students at NHRHS to be tested for drugs or alcohol in their system. Five of those eight students tested positive. Further, both Mr. McDonald and Nurse Kiely were members of CORE, the student assistance drug team.[22]

Plaintiffs have failed to show that the need for more training of NHRHS's teachers, nurses and officials was so evident and "so likely to result in violations of constitutional rights", that the NHRHS Board of Education members can "reasonably [be] said to have been deliberately indifferent to the con-

19. Generally, courts must first determine that the defendant's employees inflicted a cognizable injury on the plaintiff before addressing whether the defendant failed to adequately train its employees. In the instant case, however, the Court shall dismiss Plaintiffs' claim against the NHRHS Board of Education on the ground that the Board is immune from suit. · Thus, the Court need not determine whether Nurse Kiely, Mr. McDonald or Mr. Musco inflicted a cognizable injury on Tara.

20. "That a particular [staff member] may be unsatisfactorily trained will not alone suffice to fasten liability on the [Board of Education], for the [staff member's] shortcomings may have re-

sulted from factors other that a faulty training program." *Canton,* 489 U.S. at 390–91, 109 S.Ct. 1197.

21. At the time of the incident, Nurse Kiely had been a nurse for 11 years and had worked at NHRHS as a full time nurse for 4 years.

22. CORE (not an acronym) is a student assistance team comprised of guidance counselors, teachers, school nurse and school officials whose purpose is to address drug related problems and organize interventions when necessary. Kiely Dep. at 8:3–10.

stitutional needs of the [students]." *Brown*, 117 S.Ct. at 1392. Thus, Defendants' motion for summary judgment dismissing Counts V and VI is granted.

## THE NHRHS POLICY IS UNCONSTITUTIONALLY VAGUE

■ In their main brief, Plaintiffs for the first time challenge the first paragraph of the NHRHS Policy as unconstitutionally vague. Paragraph 1 provides:

Any staff member to whom it appears that a pupil may be under the influence of alcoholic beverages or other drugs on school property or at a school function shall report the matter as soon as possible to the Principal or his/her designee. The substance abuse counselor and nurse shall be notified by the Principal/designee.

NHRHS Policy at 1, ¶ 1. Plaintiffs maintain that the language "[a]ny staff member to whom it appears that a pupil" is unconstitutionally vague because the NHRHS Policy contains no articulated standards or objective factors to guide the school staff in determining whether a pupil appears to be under the influence. Plaintiffs, however, have failed to plead this claim in their Complaint. The Complaint does not contain any allegation that the NHRHS Policy or portions thereof are unconstitutional or unconstitutionally vague. The Court may not entertain a claim which is raised for the first time in a brief in support of a motion for summary judgment. Thus, Plaintiff's motion seeking the Court's determination that the NHRHS Policy is unconstitutionally vague is denied for failure to plead the claim properly.

## STATE LAW CLAIMS

Count IX alleges that the phlebotomist, Ms. Neumann, committed assault and battery when she jabbed Tara five times in an attempt to draw blood. Compl. ¶ 67. Count X alleges that as Ms. Neumann's employer, Urgent Care is liable for Ms. Neumann's actions. *Id.* ¶ 69. Count XI asserts that Urgent Care's failure to properly train and supervise Ms. Neumann caused Tara's injuries. *Id.* ¶ 71.

■ In cases where there are both federal and state law claims and the federal claims are dismissed, the Court may also dismiss the state law claims on jurisdictional grounds. This Court cannot exercise pendent jurisdiction over state law claims unless, at a minimum, there is:

a federal claim of sufficient substance to confer subject matter jurisdiction on the court. The substantiality of the federal claim is ordinarily determined on the basis of the pleadings. If it appears that the federal claim is subject to dismissal under F.R.Civ.P. 12(b)(6) or could be disposed of on a motion for summary judgment under F.R.Civ.P. 56, then the court should ordinarily refrain from exercising jurisdiction in the absence of extraordinary circumstances.

*Tully v. Mott Supermarkets, Inc.*, 540 F.2d 187, 196 (3d Cir.1976) (citations omitted); *see also University of Maryland at Baltimore v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1540 (3d Cir.1993).

■ This Court's dismissal of Plaintiffs' § 1983 claims and the absence of any "extraordinary circumstances" necessitates the refusal to exercise pendent jurisdiction over the state law claims in this case. Accordingly, Counts IX, X and XI are dismissed for lack of subject matter jurisdiction.

## ORDER

This matter having come before the Court on the motion for summary judgment of Defendants Ralph Musco, Greg McDonald, Cathy Kiely, Northern Highlands Regional High School Board of Education, Alan Geisenheimer, William Beisswanger, Mary Laurent, Barclay Blayman, Harold Deniear, Lynette Krueger, Patricia Dubie, Linda Kempey, Nora Oliver, Tina Malizia, Neal Strohmeyer, Urgent Care–Waldwick, Health Net Medical Group and Barbara Neumann (incorrectly named in the Complaint as Barbara Newman) (collectively "Defendants") and the cross-motion for summary judgment on Counts I, II, III and IV of Plaintiffs Dana and George Hedges ("Plaintiffs"); and the Court having considered the submissions of the parties; and good cause appearing,

IT IS on this 26th day of January, 1999,

ORDERED that Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56(c) is GRANTED;

IT IS FURTHER ORDERED that Plaintiffs' cross-motion for summary judgment on Counts I, II, III and IV is DENIED;

IT IS FURTHER ORDERED that the Complaint is DISMISSED and all cross-claims are DISMISSED as moot;

IT IS FURTHER ORDERED that Plaintiffs' claim challenging the Northern Highlands Regional High School Board of Education's Revised Drug, Alcohol and Tobacco Policy as unconstitutionally vague is DISMISSED; and

IT IS FURTHER ORDERED that a copy of this Order be served on all parties within seven (7) days of the date of this Order.