

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-22-2000

# Hedges v. Musco, et al.

Precedential or Non-Precedential:

Docket 99-5111

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Hedges v. Musco, et al." (2000). *2000 Decisions.* Paper 32.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/32

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed February 22, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 99-5111

DANA HEDGES; GEORGE HEDGES,
on behalf of C.D. Minor,
Appellants

v.

RALPH MUSCO, Individually and as Principal of Northern
Highlands Regional High School; GREG MCDONALD;
CATHY KIELY; NORTHERN HIGHLANDS REGIONAL HIGH
SCHOOL BOARD OF EDUCATION; ALAN GEISENHEIMER,
individually and as President and a member of the
Northern Highlands Regional High School Board of
Education; WILLIAM BEISSWANGER, individually and as
President and a member of the Northern Highlands
Regional High School Board of Education; MARY
LAURENT; BARCLAY BLAYMAN; HAROLD DE NIEAR;
LYNNETTE KRUEGER; PATRICIA DUBIE; LINDA KEMPEY;
NORA OLIVER; TINA MALIZIA; NEAL STROHMEYER,
individually and as members of the Northern Highlands
Regional High School Board of Education; URGENT
CARE-WALDWICK; HEALTH NET MEDICAL GROUP;
BARBARA NEWMAN

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civil Action No. 96-cv-05135)
District Judge: Honorable Joseph A. Greenaway, Jr.

Argued November 17, 1999

BEFORE: ALITO and STAPLETON, Circuit Judges,
and FEIKENS,* District Judge

_____

* Hon. John Feikens, Senior United States District Judge for the Eastern
District of Michigan, sitting by designation.

(Opinion Filed: February 22, 2000)

        Steven M. Latimer (Argued)
        Loughlin & Latimer
        131 Main Street, Suite 235
        Hackensack, NJ 07601
         Attorney for Appellants

Robert T. Morgenstern (Argued)
Dolan & Dolan
53 Spring Street & One Legal Lane
P.O. Box D
Newton, NJ 07860
 Attorney for Appellees
Musco, McDonald, Kiely, Northern
Highlands Regional High School
Board of Education and all named
members thereof

Douglas J. Sherman (Argued)
Louis A. Ruprecht
Ruprecht & Hart
306 Main Street
Millburn, NJ 07041
 Attorneys for Appellees
Healthnet Medical Group and
Barbara Newman

Ronald K. Chen
Rutgers Constitutional Litigation
 Clinic
15 Washington Street
Newark, NJ 07102
 Attorney for Amicus Curiae
American Civil Liberties Union of
New Jersey

OPINION OF THE COURT

STAPLETON, Circuit Judge:

Parents of a high school student commenced this action against a teacher, school officials, and members of the

2

school board ("the NHRHS defendants"), alleging that, by requiring her to submit to a blood test and urinalysis, their child was subjected to an unconstitutional search and that, by disclosing the results of those tests, the defendants violated the child's right to privacy. In addition, plaintiffs argue that the school's drug policy is unconstitutionally vague and assert a state-law claim for assault and battery against the health care provider and nurse ("the medical defendants") who administered the blood test. The District Court granted the defendants' motion for summary judgment and denied plaintiffs' cross-motion for summary judgment. Accordingly, in our review, we view all of the evidence, and draw all inferences therefrom, in the light most favorable to the plaintiffs. See Wicker v. Consolidated

Rail Corp., 142 F.3d 690, 696 (3d Cir. 1998). We will affirm.

I.

At approximately 9:18 a.m. on April 8, 1996, Tara Hedges was entering her third-period class, Defendant Greg McDonald's math class, at Northern Highlands Regional High School ("NHRHS"). As she entered the classroom, McDonald observed that she seemed uncharacteristically talkative and outgoing. In addition, her face wasflushed; her eyes were glassy and red; and her pupils were dilated. It is likewise undisputed, however, that Tara's speech was not slurred, McDonald did not smell anything on her breath, and she did not smell of marijuana.

During the math class, Tara asked permission to leave the room to get a drink from the water fountain, which is located within view of McDonald's classroom door. Instead of getting a drink of water, however, Tara went in the opposite direction from the water fountain and disappeared around the corner of the hallway. Tara was gone for approximately ten minutes.1 McDonald testified that it was not consistent with Tara's normal behavior to ask permission to go someplace and then leave the room to go

_____

1. Tara actually went to the lavatory and was seen there by school security officer, Ms. Justine Rucki, who testified that Tara's eyes were red and she looked sick. Ms. Rucki suggested that Tara go see the school nurse, but Tara refused.

3

elsewhere. Based on Tara's appearance and uncharacteristic behavior, McDonald suspected that Tara was under the influence of alcohol or some other drug.

The NHRHS Board of Education's Revised Drug, Alcohol and Tobacco Policy ("NHRHS Policy" or "Policy") provides that:

> Any staff member to whom it appears that a pupil may
> be under the influence of alcoholic beverages or other
> drugs on school property or at a school function shall
> report the matter as soon as possible to the Principal
> or his/her designee. The substance abuse counselor
> and nurse shall be notified by the Principal/designee.

App. 26. In accordance with this Policy, McDonald contacted a school administrator and reported his suspicion that Tara was "high."

Whenever a school official suspects that a student is

under the influence of drugs or alcohol, school policy dictates that the student "shall be escorted to the school nurse for an examination of any dangerous vital signs." Id. Pursuant to that Policy, at the end of the class period, a school security guard escorted Tara from Mr. McDonald's classroom to the nurse's office. The school nurse, Defendant Cathy Kiely, testified that her first impression of Tara when she saw her that day was "oh, my God, she looked so high. . . . She just looked totally out of it. She just didn't know where she was. Her eyes were red, they were glassy, she looked stuporous, she looked high .. . . [She had a] [b]lank look, staring into space, looking right through me, just out of it." App. 180-81 (Kiely Deposition). Nurse Kiely informed Tara that she was suspected of being under the influence of drugs or alcohol and that her vital signs would have to be checked. Nurse Kiely checked Tara's vital signs and found that her blood pressure was elevated but her pulse and respirations were normal. Although Tara's eyes were bloodshot, her pupils were normal. At no point during the examination did Tara offer an explanation for her uncharacteristic appearance.

"For students suspected of being under the influence of alcohol/drugs," the NHRHS Policy provides that,"if there is reasonable suspicion, the Principal/designee may conduct

4

a search, including lockers and bookbags, luggage, etc. . . ." App. 28. In accordance with the Policy, a school security guard searched Tara's locker but found nothing incriminating. The guard also searched Tara's bookbag in Tara's and Nurse Kiely's presence. The search revealed an old, worn, plastic bottle containing some small white pills and a large brown pill. Tara told Nurse Kiely that they were diet pills. NHRHS students are prohibited from possessing medication of any kind, including prescription and over-the-counter medications.

Finally, the NHRHS Policy directs that, when a student is suspected of being under the influence of drugs or alcohol, "[t]he Principal/designee shall immediately notify a parent or guardian and the Superintendent and arrange for an immediate medical examination of the student." App. 26. When Nurse Kiely asked Tara for a phone number where her parents could be reached, however, Tara was unable to remember the relevant numbers. After retrieving the phone numbers, and in accordance with the NHRHS Policy, Nurse Kiely called Tara's father, Plaintiff George Hedges, and asked him to come to her office. When Mr. Hedges arrived, Nurse Kiely informed him that Tara was suspected of being under the influence of drugs or alcohol. The school principal, Defendant Ralph Musco, showed Mr. Hedges the

pills that were found in Tara's bookbag. When it was suggested that the pills might be diet pills, Mr. Hedges responded: "I know for a fact that she's not on a diet." App. 201, 242. Mr. Hedges took the pills, stating that he would find out what they were.[2]

Either Nurse Kiely or Mr. Musco told Mr. Hedges that Tara would have to be tested for drug and alcohol use before she would be permitted to return to school. The NHRHS Policy provides that "[t]he examination may be performed by a physician selected by the parent or guardian, or by the school doctor if s/he is immediately available. . . . If, at the request of the parent or guardian,

_____

2. Mr. Hedges did not have the pills tested, however. He claims that he showed the pills to a pharmacist who opined that they could be diet pills and vitamins. For purposes of this motion, the NHRHS Defendants concede that the pills were diet pills and vitamins.

the medical examination is conducted by a physician other than the school doctor, such an examination shall be at the expense of the parent and not the school district." App. 26. Either Mr. Musco or Nurse Kiely told Mr. Hedges that the school generally used Urgent Care,[3] and Mr. Hedges took Tara there.

Shortly after Mr. Hedges and Tara arrived at Urgent Care, an Urgent Care doctor, Dr. Foley, who has not been named as a defendant, examined Tara. Based on the physical examination, Dr. Foley concluded that Tara did "not appear to be under the influence of any illicit substance or alcohol" and there was "no evidence of any chronic use of illicit substances or alcohol." App. 96 (medical report). Tara then provided Urgent Care with a urine specimen.

Nurse Barbara Neumann attempted to draw blood from Tara's right arm but was unsuccessful. She then attempted to draw blood from Tara's left arm but was also unsuccessful. The parties dispute what happened next. According to Ms. Neumann, after the two unsuccessful attempts, she left the room and summoned Dr. Foley. Tara testified, however, that Ms. Neumann inserted a needle in her arms five times unsuccessfully before asking for Dr. Foley's help. Tara also testified that, when Ms. Neumann left the room to get Dr. Foley, she left the tourniquet on Tara's arm. Ms. Neumann denies doing so. Dr. Foley was able to draw blood from Tara's arm on his first attempt. Plaintiffs allege that Tara suffered hematoma in both arms as a result of Ms. Neumann's actions.

Later that day, Mr. Hedges contacted his attorney, Warren Clark. The next day, April 9, 1996, the Hedges and Mr. Clark met with Principal Musco at 7:20 a.m. Nurse Kiely called Urgent Care at approximately 7:30 a.m. that same morning for the results of Tara's drug and alcohol tests. The test results were negative for drugs and alcohol, and NHRHS readmitted Tara in time for her second period class on April 9th.

When Tara returned to school that day, a student

_____

3. Urgent Care is now known as "Health Net Medical Group of New Jersey."

approached her and told her that he had overheard Nurse Kiely on the phone when she was obtaining Tara's results. The student told Tara that he heard Nurse Kiely say, "Negative? Are you sure? You are kidding. I am shocked." App. 406 (Tara Hedges Deposition). By the end of the school day, many students knew that Tara had been tested for drugs and alcohol. Thirty to forty students asked Tara what had happened and asked to see the bruises on her arms; they asked if she had been caught using drugs. Tara perceived that the students believed that she had actually done something wrong. Tara further testified that she has lost friends as a result of the incident and also has lost a number of babysitting jobs.

The plaintiffs filed this civil rights action under 42 U.S.C. S 1983. They allege that the NHRHS Defendants subjected their daughter to an intrusive search, including the testing of bodily fluids, without reasonable suspicion, in violation of the Fourth and Fourteenth Amendments' protection against unreasonable searches and seizures and in violation of the New Jersey Constitution. Plaintiffs further allege that defendants disclosed the results of the search to NHRHS students in violation of their daughter's right to privacy under the Ninth and Fourteenth Amendments. Plaintiffs' third claim is that the NHRHS drug testing policy is unconstitutionally vague. Finally, plaintiffs assert a pendent state-law claim for assault and battery against the medical defendants.

The defendants moved for summary judgment on all counts, and the plaintiffs made a cross-motion for summary judgment with respect to their claims that the search violated both the United States and New Jersey Constitutions. The District Court granted the defendants' motion for summary judgment and denied the plaintiffs' cross-motion for summary judgment. See Hedges v. Musco,

33 F. Supp.2d 369 (D.N.J. 1999). This appeal followed.4
_____

4. Plaintiffs have not appealed the District Court's decision to grant
defendants' motion for summary judgment on Counts V and VI of the
Complaint, which alleged that the NHRHS school board and its
individual members "were deliberately indifferent to the rights of
plaintiff
in that they failed to adequately train, supervise, and control faculty
and

staff of NHRHS in the procedures to be followed if a student is suspected
of substance abuse." App. 10. Accordingly, we will not review those
claims.

7


II.

The District Court had jurisdiction pursuant to 28 U.S.C.
SS 1331 and 1343(a)(3). This Court has appellate
jurisdiction over the District Court's final order. See id.
S 1291. We exercise plenary review over the District Court's
decision to grant summary judgment. See Wicker v. Consol.
Rail Corp., 142 F.3d 690, 696 (3d Cir. 1998). Summary
judgment is appropriate only if there is no genuine issue of
material fact, and the moving party is entitled to a
judgment as a matter of law. See id.; Fed. R. Civ. P. 56(c).

III.

The New Jersey legislature has promulgated a statutory
scheme designed to combat the problems of drug and
alcohol abuse in New Jersey schools. See N.J.S.A.
S 18A:40A-8 et seq.5 As a part of that scheme, the following
provision was enacted:
_____

5. The statute provides in relevant part:

        Whenever it shall appear to any teaching staff member, school nurse
        or other educational personnel of any public school in this State
        that a pupil may be under the influence of substances as defined
        pursuant to section 2 of this act, other than anabolic steroids,
that
        teaching staff member, school nurse or other educational personnel
        shall report the matter as soon as possible to the school nurse or
        medical inspector, as the case may be, or to a substance awareness
        coordinator, and to the principal or, in his absence, to his
designee.
        The principal or his designee, shall immediately notify the parent
or
        guardian and the superintendent of schools, if there be one, or the

administrative principal and shall arrange for an immediate examination of the pupil by a doctor selected by the parent or guardian, or if that doctor is not immediately available, by the medical inspector, if he is available. . . . The pupil shall be examined as soon as possible for the purpose of diagnosing whether or not the

pupil is under such influence. A written report of that examination shall be furnished within 24 hours by the examining physician to the parent or guardian of the pupil and to the superintendent of schools or administrative principal.

N.J.S.A. 18A:40A-12. The regulations enacted pursuant to that title require that the "[d]istrict board of education . . . adopt and implement policies and procedures for the evaluation . . . of pupils . . . who on reasonable grounds are suspected of being under the influence." N.J.A.C. S 6:29-6.3. The NHRHS Policy is an effort to comply with this mandate.

8

No action of any kind in any court of competent jurisdiction shall lie against any teaching staff member, including a substance awareness coordinator, any school nurse or other educational personnel, medical inspector, examining physician or any other officer, agent or any employee of the board of education or personnel of the emergency room of a hospital because of any action taken by virtue of the provisions of this act, provided the skill and care given is that ordinarily required and exercised by other teaching staff members, nurses, educational personnel, medical inspectors, physicians or other officers, agents, or any employees of the board of education or emergency room personnel.

N.J.S.A. S 18A:40A-13. The District Court, relying on that provision, held that Mr. McDonald, Nurse Kiely, and Mr. Musco, as school officials within the meaning of the statute, were immune from the plaintiffs' suit.

In Good v. Dauphin Co. Social Serv. for Children and Youth, 891 F.2d 1087, 1091 (3d Cir. 1989), however, we held that "state law cannot immunize government employees from liability resulting from their violation of federal law." We explained:

[A state] immunity statute, although effective against a state tort claim, has no force when applied to suits under the Civil Rights Acts. The supremacy clause of the Constitution prevents a state from immunizing entities or individuals alleged to have violated federal law. This result follows whether the suit to redress

federal rights is brought in state or federal court. Were the rule otherwise, a state legislature would be able to frustrate the objectives of a federal statute.

Id. (quoting Wade v. City of Pittsburgh , 765 F.2d 405, 407–408 (3d Cir. 1985) (citations omitted)).

The District Court, therefore, erred in holding that the school officials were immunized from plaintiffs' federal claims by the New Jersey statute.6 Because we may affirm

_____

6. The District Court did not address whether the state statute provides immunity to the defendants from plaintiffs' state constitutional claims

9

a district court's grant of summary judgment on any ground that appears in the record, however, we will proceed to consider the merits of plaintiffs' case.

IV.

The NHRHS defendants assert qualified immunity as an alternative ground for affirming the District Court. As the Supreme Court has recognized, however, "even afinding of qualified immunity requires some determination about the state of constitutional law at the time the officer[s] acted." County of Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998). Because "[a]n immunity determination, with nothing more, provides no clear standard, constitutional or nonconstitutional," id., and because we ultimately conclude that plaintiffs have failed to demonstrate a violation of the Fourth Amendment, we will address plaintiffs' Fourth Amendment claim on the merits. See Medeiros v. O'Connell, 150 F.3d 164, 169 (2d Cir. 1998) (recognizing that"the Supreme Court expressed its preference that courts address first the merits of the constitutional claims presented before turning to an analysis of qualified immunity" and affirming on the merits).

In T.L.O. v. New Jersey, the Supreme Court recognized that "[i]t is now beyond dispute that `the Federal Constitution, by virtue of the Fourteenth Amendment, prohibits unreasonable searches and seizures by state officers.' Equally indisputable is the proposition that the Fourteenth Amendment protects the rights of students against encroachment by public school officials." 469 U.S. 325, 334 (1985) (quoting Elkins v. United States , 364 U.S. 206, 213 (1960)). Nevertheless, the Court decided that the probable cause standard, applicable to most warrantless searches, was not appropriate in a school setting. See id. at 341. Rather, the Court explained:

> [T]he legality of a search of a student should depend
> simply on the reasonableness, under all the

_____

brought under Article I, paragraph 7 of the New Jersey Constitution. We
need not decide the issue, however, because as we will explain, we
ultimately conclude that the NHRHS defendants are entitled to summary
judgment on the merits of the state claim. See infra note 12.

> circumstances, of the search. Determining the
> reasonableness of the search involves a twofold inquiry:
> first, one must consider "whether the . . . action was
> justified at its inception," Terry v. Ohio , 392 U.S. [1,] 20
> [(1968)]; second, one must determine whether the
> search as actually conducted "was reasonably related
> in scope to the circumstances which justified the
> interference in the first place," ibid. Under ordinary
> circumstances, a search of a student by a teacher will
> be "justified at its inception" when there are reasonable
> grounds for suspecting that the search will turn up
> evidence that the student has violated or is violated
> either the law or the rules of the school. Such a search
> will be permissible in its scope when the measures
> adopted are reasonably related to the objectives of the
> search and not excessively intrusive in light of the age
> and sex of the student and the nature of the infraction.

Id. at 341–42 (footnotes omitted).

The Supreme Court has recently said that "[a]rticulating
precisely what `reasonable suspicion' . . . mean[s] is not
possible." Ornelas v. United States, 517 U.S. 690, 695
(1996). It is a "commonsense, nontechnical conception[ ]
that deal[s] with the factual and practical considerations of
everyday life on which reasonable and prudent men, not
legal technicians, act." Id. (internal quotation omitted); see
also Karnes v. Skrutski, 62 F.3d 485, 495 (3d Cir. 1995)
("The test for reasonable suspicion is a totality of the
circumstances inquiry.").

Applying those legal principles to the facts of this case,
we hold that defendants McDonald, Kiely, and Musco's
suspicion that Tara was "high" was reasonable. In addition,
we believe that the searches were reasonable in scope and
not excessively intrusive.

A. Mr. McDonald, Nurse Kiely and the School Search

As we have explained, when Tara entered Mr. McDonald's
class on the morning of April 8, 1996, she was behaving in

an uncharacteristically gregarious manner. In addition, her face was flushed; her eyes were glassy and red; and her pupils were dilated. Then during class, Tara, after obtaining permission to leave the room to get a drink of water,

proceeded in the opposite direction, disappeared around the corner of the hallway, and did not return for approximately ten minutes. All of this was inconsistent with Tara's normal behavior and appearance. In our view, these facts gave Mr. McDonald a sufficiently "particularized and objective basis" for suggesting that Tara be examined by the school nurse. United States v. Cortez, 449 U.S. 411, 417–418 (1981). While, as plaintiffs point out, Tara's speech was not slurred, McDonald did not smell anything on her breath, and she did not smell of marijuana, those facts do not undermine the reasonableness of McDonald's suspicion. Tara may not have possessed every characteristic that may be exhibited by a person who has consumed alcohol or other drugs, but the symptoms she did manifest created a reasonable suspicion that she had consumed some quantity of alcohol or other drugs. McDonald had reasonable grounds for suspecting that a further and more comprehensive evaluation of Tara might produce evidence of such consumption.

It bears noting that McDonald did not immediately order Tara to submit to a blood test and urinalysis. Rather, pursuant to school policy, he had her escorted to Nurse Kiely's office for further examination. Because Nurse Kiely's examination only involved observing Tara and checking her vital signs, we hold that the scope of the search at this point was reasonably related to its objectives and not excessively intrusive given the age and sex of the student and the nature of the infraction. Because requiring Tara to submit to Nurse Kiely's examination represents the full extent of McDonald's participation in the relevant events, McDonald's conduct did not amount to a Fourth Amendment violation.

Before Nurse Kiely conducted her "vital signs" examination, her own observations in her office led her to conclude that Tara's behavior and appearance were abnormal and consistent with her having consumed alcohol or another drug. Given those observations and McDonald's report, Nurse Kiely's ensuing, limited examination did not, in our view, constitute an unreasonable search. 7

_____

7. We do not understand Nurse Kiely to have participated in the subsequent decision to require a blood test and urinalysis. If she bears any responsibility for that decision, she has noS 1983 liability to the

plaintiffs for the same reason, as explained hereafter, that Principal Musco has no such liability.

A recent decision by the Seventh Circuit Court of Appeals supports our analysis. The case, Bridgman v. New Trier High School Dist. No. 203, 128 F.3d 1146 (7th Cir. 1997), involved facts similar to those at issue here. The Court summarized the facts in that case as follows:

> Dailey noticed that Bridgman and several other students were giggling and acting in an unruly fashion. Bridgman acknowledges that he was laughing with the other students, but denies being unruly. Dailey states that while the other students quickly calmed down, Bridgman remained distracted and behaved inappropriately during the program. Dailey says she noticed that Bridgman's eyes were bloodshot and his pupils dilated. She also claims that his handwriting was erratic on a worksheet that he completed as part of the program, and that some of his answers were "flippant."
>
> * * *
>
> After Bridgman had spoken to his mother, Dailey took him into another adjoining room, where she had the school's Health Services Coordinator, Nurse Joanne Swanson, administer a "medical assessment" of Bridgman. The assessment consisted of taking Bridgman's blood pressure and pulse. Swanson noted that both of these readings were considerably higher than those listed on the record of Bridgman's freshman physical examination. Swanson was concerned about the high blood pressure and pulse measurements, but at no time reached the conclusion that Bridgman was under the influence of drugs. She also noted that Bridgman's pupils were dilated, but did not notice that his eyes were bloodshot, or that he was acting strangely in any way.

Id. at 1147, 1148. The following day, at his mother's instruction, the student underwent a drug test, which indicated that he had not in fact been using marijuana. The student then brought suit under S 1983, alleging that the medical assessment and a subsequent search of his outer clothing were unreasonable and, thus, violated his Fourth Amendment rights.

The Court rejected his claim, holding that "[t]he symptoms were sufficient to ground Daily's suspicion, and the medical assessment was reasonably calculated to uncover further evidence of the suspected drug use." Id. at 1149. The analysis conducted by the Seventh Circuit Court of Appeals suggests that, where a teacher's suspicion is based on objective facts that suggest that a student may be under the influence of drugs or alcohol, an examination of the kind here performed by Nurse Kiely will be permissible.[8]

B. Principal Musco and the Urgent Care Search

In T.L.O., the Supreme Court, after concluding that it was reasonable for a teacher to search a student's purse for cigarettes after being informed that the student was smoking in the lavatory, further held that additional information secured in the course of the search warranted more intrusive, follow-up searches. See 469 U.S. at 347. TLO thus "justifies escalating searches . .. if the discovery of new evidence warrants them." Recent case, 111 HARV. L. REV. 1341, 1345-46 (1997).

Here, too, the information learned as the investigation progressed provided additional justification for the decision to require a blood test and urinalysis. After Tara arrived at Nurse Kiely's office and before she went to the Urgent Care for the blood test and urinalysis, Principal Musco learned that her blood pressure was above normal, and that she was unable to remember her parents' day-time phone numbers. In addition, at some point during this process, Tara's book bag was searched.[9] An old pill bottle,

_____

8. Plaintiffs assert that their case is more like another case from the Seventh Circuit Court of Appeals, Willis v. Anderson Community School Corp., 158 F.3d 415 (7th Cir. 1998). We disagree. In Willis, a student was suspended for fighting with a fellow student and, based solely on the fact that he had been in a fight, the school required him to be tested for drug and alcohol use before being allowed to return to school. Even though the school submitted evidence tending to show that students who fight are more likely to use drugs than other students, the Court held that a single fight did not create a reasonable suspicion. See id. at 418-19. The Court expressly distinguished Bridgman on the ground that the student there exhibited multiple signs of drug use. See id. at 419-20. We find the present case similarly distinguishable.

9. Plaintiffs do not challenge the constitutionality of this search.

14

containing two different types of unidentified pills, was discovered there. As Tara had not registered any medications with the Nurse, her possession of those pills --

whether they were illegal drugs or not -- was a violation of school policy. Tara's explanation for the pills was that they were diet pills, but her father informed Principal Musco that he was confident Tara was not on a diet.

Based on the combination of Mr. McDonald's observations (which were confirmed, except for the dilated pupils, by the Nurse) and this newly gathered evidence, it simply cannot be said that Principal Musco lacked reasonable grounds for concluding that a further search would produce additional evidence of drug consumption.10

Accordingly, we turn to the issue of whether the search ordered by Principal Musco was reasonably related to its objectives and not excessively intrusive given the age and sex of the student and the nature of the infraction. Certainly a drug test is reasonably related to the objective of determining whether a student is under the influence; the issue then is whether a urinalysis and blood test were excessively intrusive given the nature of the suspected infraction.

The Supreme Court has recognized that "collecting samples for urinalysis intrudes upon `an excretory function traditionally shielded by great privacy.' " Vernonia School Dist. 47J v. Acton, 515 U.S. 646, 658 (1995) (quoting Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 626 (1989)). The Court cautioned, however, that"the degree

_____

10. In contrast, in Sostarecz v. Misko, No. CIV. A. 97-CV-2112, 1999 WL 239401 (E.D. Pa. Mar. 26, 1999), the district court held that an additional search was not warranted. In that case, a student was suspected of using drugs solely by virtue of the fact that she exhibited inappropriate behavior in class. The student was sent to the nurse's office, but the nurse's test produced only normal results. Nevertheless, the school official proceeded to strip search the student in an effort to find further evidence of drug use. The district court held that, "once [the

nurse's] test produced normal results, the Court does not believe that a reasonable person would then force the student to remove her pants so that her legs could be checked for signs of drug use." Id. at *6. This case

is materially different.

15

of intrusion depends upon the manner in which production of the urine sample is monitored." Id. In Vernonia,11 the Supreme Court observed:

> Under the District's Policy, male students produce
> samples at a urinal along a wall. They remain fully
> clothed and are only observed from behind, if at all.
> Female students produce samples in an enclosed stall,
> with a female monitor standing outside listening only
> for sounds of tampering. These conditions are nearly
> identical to those typically encountered in public
> restrooms, which men, women, and especially school
> children use daily. Under such conditions, privacy
> interests compromised by the process of obtaining
> urine samples are in our view negligible.

Id.

In this case, Tara's urinalysis was performed at a private
medical clinic. Nurse Neumann described the urinalysis
procedure as follows:

> The patient would be sent to the lavatory, where the
> water has previously been turned off. . . . The patient
> takes the large container and goes into the restroom
> and fills it up. . . . They bring it back into the room.
> . . . I check the temperature on it, then they pour it
> into the containers. . . . The patient goes into the
> bathroom with the cup by themselves. We don't go in
> with him -- with them.

App. 432-34. Based on Vernonia, we hold that the
urinalysis performed on Tara Hedges was not excessively
intrusive given the age and sex of the student and the
nature of the infraction.

In addition to the urinalysis, Principal Musco ordered
that a blood-alcohol test be performed. Plaintiffs assert that
"either a saliva strip or the breathalyser are more effective
tools to determine alcohol use . . . and are less intrusive
than a blood test." Brief for Appellant at 44. Plaintiffs
misconceive T.L.O.'s standard, however. T.L.O. did not hold

_____

11. In Vernonia, the Supreme Court upheld the constitutionality of
suspicionless drug testing of student athletes.

16

that the search must be the least intrusive way of achieving
its objectives; it held that the search must not be
excessively intrusive. See T.L.O., 469 U.S. at 342.
Therefore, the mere fact that there are less intrusive means
of ascertaining whether a student has consumed alcohol,
though perhaps probative, is not dispositive of the
reasonableness of the search.

The Supreme Court has upheld the use of blood-alcohol tests in a multitude of cases. In Schmerber v. California, the Court explained:

> Extraction of blood samples for testing is a highly effective means of determining the degree to which a person is under the influence of alcohol. . . . Such tests are a [sic] commonplace in these days of periodic physical examination and experience with them teaches that the quantity of blood extracted is minimal, and that for most people the procedure involves virtually no risk, trauma, or pain.

384 U.S. 757, 771 (1966) (citation and footnote omitted); see also Skinner v. Railway Labor Executives' Assn. , 489 U.S. 602, 625 (1989) ("the intrusion occasioned by a blood test is not significant"); Winston v. Lee , 470 U.S. 753, 762 (1985) ("society's judgment [is] that blood tests do not constitute an unduly extensive imposition on an individual's privacy and bodily integrity"); South Dakota v. Neville, 459 U.S. 553, 563 (1983) ("The simple blood-alcohol test is . . . safe, painless, and commonplace"); Breithaupt v. Abram, 352 U.S. 432, 436 (1957) ("The blood test procedure has become routine in our everyday life"). Based on these Supreme Court precedents, we hold that requiring Tara to submit to a blood-alcohol test, administered by professionals in a medical testing clinic, was reasonable, taking into account her age, sex, and the nature of the suspected infraction.

In summary, we conclude that the searches of Tara Hedges were reasonable under all the circumstances. 12 See

_____

12. Having established that there was no federal constitutional violation, defendants must also prevail on plaintiffs' claims under Article I, paragraph 7 of the New Jersey Constitution. See Desilets v. Clearview

17

T.L.O., 469 U.S. at 341. Each was justified at its inception and reasonably related in scope to the circumstances which justified the interference in the first place. 13 See id. at 341–42. Summary judgment in favor of the NHRHS defendants on the unreasonable search claims was therefore appropriate.

V.

Plaintiffs' second claim is that the NHRHS defendants violated Tara's right to privacy under the Ninth and Fourteenth Amendments by disclosing the results of the drug tests. It is well established that the constitutional

right to privacy protects two types of privacy interests: "One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." Whalen v. Roe, 429 U.S. 589, 599-600 (1977) (footnotes omitted). Plaintiffs' asserted privacy interest falls within the first class. The District Court rejected this claim, holding that the results of the drug tests were not medical records and, thus, were not entitled to privacy protection. See Hedges v. Musco, 33 F. Supp.2d 369, 381 (D.N.J. 1999). We find it unnecessary to reach the question of whether the results of the drug tests were entitled to constitutional privacy protection, because we perceive no nexus between the injury plaintiffs allege that Tara suffered and Nurse Kiely's inadvertent revelation of the results of Tara's drug tests.

It is axiomatic that "[a] S 1983 action, like its state tort analogs, employs the principle of proximate causation."

_____

Regional Bd. of Educ., 627 A.2d 667, 673 (N.J. Super. App. Div. 1993) ("We are not persuaded that the New Jersey Constitution provides greater protection under the circumstances of this case than its federal counterpart. We note that in its T.L.O. opinion the New Jersey Supreme Court analyzed the search and seizure issue under the Fourth Amendment to the United States Constitution, and did not suggest that New Jersey's organic law imposed more stringent standards.").

13. Because we conclude that the search was reasonable, we need not reach the NHRHS defendants' argument that plaintiffs consented to the search.

18

Townes v. City of New York, 176 F.3d 138, 146 (2d Cir. 1999) (citations omitted); see also Gierlinger v. Gleason, 160 F.3d 858, 872 (2d Cir. 1998) ("as in all S 1983 cases, the plaintiff must prove that the defendant's action was a proximate cause of the plaintiff 's injury"); Kneipp v. Tedder, 95 F.3d 1199, 1213 (3d Cir. 1996) (in a S 1983 suit, "[a] plaintiff must . . . establish that the government policy or custom was the proximate cause of the injuries sustained"). "To establish the necessary causation, a plaintiff must demonstrate a `plausible nexus' or `affirmative link' between the [defendant's action] and the specific deprivation of constitutional rights at issue." Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990) (citation omitted).

In this case, plaintiffs allege that Tara was injured by the NHRHS defendants' disclosure of the results of her drug tests. Specifically, Tara testified that she perceived that students suspected that she had done something wrong. She further testified that she has lost friends as a result of

the incident and also has lost a number of babysitting jobs. Contrary to plaintiffs' suggestions, however, it seems clear that Nurse Kiely's revelation of the results of the drug tests was not the proximate cause of the damages Tara claims to have suffered. Rather, given that those results were negative, it seems evident that any damages plaintiffs suffered were caused by students' knowledge of the fact that Tara was drug tested, not Nurse Kiely's disclosure of the tests' results. Accord Townes, 176 F.3d at 148 (dismissing claims and noting that "there is a gross disconnect between the constitutional violations[alleged] . . . and the injury or harm for which [plaintiff] seeks recovery . . ."). Indeed, to the extent disclosure of the negative results had any effect on the plaintiffs, it was to mitigate the damages caused by the fact that Tara was drug tested. Because we "conclude that no reasonable jury could find [Nurse Kiely's disclosure of the results of the drug tests] to be the cause of [plaintiffs'] injury," we hold that the District Court properly entered summary judgment against the plaintiffs on their privacy claim.14  Taylor v. Brentwood

_____

14. In their briefs to this Court plaintiffs have argued only that disclosure of the results of the drug tests violated Tara's right to privacy.

Union Free School Dist., 143 F.3d 679, 687 (2d Cir. 1998); see Gierlinger, 160 F.3d at 872 (to recover under S 1983, "the plaintiff must prove that the defendant's action was a proximate cause of the plaintiff 's injury").

VI.

Plaintiffs' third claim is that the NHRHS drug testing policy is unconstitutionally vague. The District Court dismissed this claim because the plaintiffs failed to plead it in their complaint. See 33 F. Supp.2d at 383. Plaintiffs concede that the issue is not raised in their complaint and that they have never sought leave to amend, but they contend that, because the defendants were on notice of the claim and even briefed the issue (apparently without raising the procedural defense), "the better course would have been to decide the issue on the merits." Brief for Appellant at 51; see Johnson v. Horn, 150 F.3d 276, 284 (3d Cir. 1998) (holding that, although the issue was not raised in the complaint or plaintiff 's motion for summary judgment, where district court was on notice that there was an issue and parties addressed it on the merits, we may reach the merits of the claim); Venuto v. Carella, Byrne, Bain, Gilfillan, Cecchi & Stewart, P.C., 11 F.3d 385, 388 (3d Cir. 1993) (same). Because the NHRHS defendants do not argue to us

that the issue has been waived and instead address it on the merits, we will entertain the plaintiffs' vagueness claim.

Plaintiffs challenge the following provision of the NHRHS school board's drug/alcohol policy: "Any staff member to whom it appears that a pupil may be under the influence of alcoholic beverages or other drugs on school property or at a school function shall report the matter as soon as

_____

See Brief for Appellant at 46 ("The [district] court erred as a matter of law
when it dismissed plaintiff 's constitutional claim based on the disclosure

by the defendants of the results of the testing . . . ."); id. at 49 (arguing
that there were no adequate safeguards to protect against disclose of the test results). The parties have not briefed, and we express no opinion on, whether under circumstances of this kind, a student in Tara's position can have a reasonable expectation of privacy in the fact that she was investigated for drug use.

possible to the Principal or his/her designee." App. 26. Plaintiffs assert that "[t]he flaw in the NHRHS policy is that the language `any staff member to whom it appears that a pupil is under the influence' provides no particularized and objective basis to guide the staff member to make an informed decision to refer the student to drug testing." Brief for Appellant at 53 (emphasis in original). In addition, they argue that the policy does not require reasonable suspicion.

We reject these arguments. The passage about which plaintiffs complain requires no more than that the teacher report the matter to the principal or the school nurse. Notably, the policy does not provide that the school may search any student who appears to be "under the influence," regardless of reasonable suspicion. Rather, the policy expressly instructs that the nurse or principal "will evaluate the student's condition," and that the principal or nurse may conduct a search only if there is reasonable suspicion. App. 28. Contrary to plaintiffs' suggestions, the school policy does not authorize the search and medical testing of every student who appears to a teacher to be under the influence.

VII.

The District Court, having dismissed all of plaintiffs' S 1983 claims and finding no extraordinary circumstances, refused to exercise supplemental jurisdiction over the

plaintiffs' state-law claims against Ultra Care and Barbara Neumann. See 33 F. Supp.2d at 383. Plaintiffs insist that this was an abuse of discretion.

Though it did not cite to S 1367, it is clear from that the District Court relied on the following provision in dismissing plaintiffs' state law claims:

> (a) . . . [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall

21

> include claims that involve the joinder or intervention of additional parties. . . .
>
> (c) The district courts may decline to exercise 840supplemental jurisdiction over a claim under
>
> subsection (a) if . . . (3) the district court has dismissed all claims over which it has original jurisdiction .. . .

28 U.S.C. S 1367(a), (c).

We recently addressed S 1367(c)(3) in Figueroa v. Buccaneer Hotel, Inc., 188 F.3d 172 (3d Cir. 1999). Like this case, "[t]he District Court [there] made no reference to section 1367 in its order dismissing Figueroa's remaining [state] claims . . . ." Id. at 181. The Court "deduce[d] from the language of the District Court, however, that the court was aware that it had the discretion to exercise supplemental jurisdiction over these claims under section 1367, but declined to do so based on the consideration set forth in section 1367(c)(3), namely, the dismissal of all claims over which the court had original jurisdiction." Id. The Court held that, "where we can readily determine that the District Court dismissed a claimant's remaining claims based on a consideration enumerated in section 1367(c), it is not reversible error for the court to not state its reasons for doing so." Id. Following Figueroa , we find no reversible error in the District Court's failure expressly to mention S 1367(c)(3), because it is clear from the Court's opinion that it was relying on that provision.

This Court has recognized that, "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of

judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." Borough of West Mifflin v. Lancaster, 45 F.3d 780, 788 (3d Cir. 1995) (emphasis added). The only fairness consideration to which plaintiffs point is that the statute of limitations on the assault and battery claim has run.15 At first glance, this argument is compelling. See Beck v. Prupis, 162 F.3d 1090,

_____

15. The statute of limitations is two years and, thus, expired on April 7, 1998.

22

1100 (11th Cir. 1998) (discussing pre-section 1367 law) ("The possibility of a claim being time-barred is an important factor in deciding whether to maintain jurisdiction over pendent claims once the federal claims have been resolved; dismissing state law claims for which the statute of limitations has run will often constitute an abuse of discretion.") (citing cases); Cooley v. Pennsylvania Housing Finance Agency, 830 F.2d 469, 476 (3d Cir. 1987) (same).

Congress foresaw the precise problem plaintiffs raise in this case, however, and prescribed a cure. When it codified the law of supplemental jurisdiction, Congress expressly provided:

> The period of limitations for any claim asserted under section (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.

28 U.S.C. S 1367(d); see also Beck v. Prupis, 162 F.3d at 1099-1100 ("a dismissal under section 1367 tolls the statute of limitations on the dismissed claims for 30 days"); Seabrook v. Jacobson, 153 F.3d 70, 72 (2d Cir. 1998) ("Section 1367(d) ensures that the plaintiff whose supplemental jurisdiction is dismissed has at least thirty days after dismissal to refile in state court."). Plaintiffs' state claims were, therefore, not time-barred at the time the District Court dismissed them. Accordingly, we find no abuse of discretion.

VIII.

We will affirm the judgment of the District Court.

A True Copy:

Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit